**Compass Golf LLC**
And
**L & J Acquisitions LLC**
as Borrowers

and

**U.S. Strategic Capital Advisors LLC**
as Lender

**LOAN AND SECURITY AGREEMENT**

Dated as of March 17, 2023

77764042.1

## LOAN AND SECURITY AGREEMENT

This **LOAN AND SECURITY AGREEMENT** (the "**Agreement**") is entered into as of March 17, 2023 (the "**Effective Date**"), by and between **U.S. STRATEGIC CAPITAL ADVISORS LLC** ("**Lender**") and **COMPASS GOLF LLC**, a Delaware corporation and **L & J ACQUISITIONS LLC,** a Wyoming corporation (collectively "**Borrowers**").

## RECITALS

Borrowers wishes to obtain credit from Lender, and Lender desires to extend credit to Borrowers. This Agreement sets forth the terms on which Lender will advance credit to Borrowers, and Borrowers will repay the amounts owing to Lender.

## AGREEMENT

The parties agree as follows:

## 1. DEFINITIONS AND CONSTRUCTION.

**1.1 Definitions.** As used in this Agreement, the following terms shall have the following definitions:

"**Accounts**" means all presently existing and hereafter arising accounts, contract rights, payments, intangibles, and all other forms of obligations owing to Borrowers arising out of the sale or lease of goods (including, without limitation, the licensing of software and other technology) or the rendering of services by Borrowers, whether or not earned by performance, and any and all credit insurance, guarantees, and other security therefor, as well as all merchandise returned to or reclaimed by Borrowers and Borrowers' Books relating to any of the foregoing.

"**Affiliate**" means, with respect to any Person, any Person that owns or controls directly or indirectly such Person, any Person that controls or is controlled by or is under common control with such Person, and each of such Person's senior executive officers, directors, and partners.

"**Borrowers' Books**" means all of Borrowers' books and records including ledgers, records concerning Borrowers' assets or liabilities, the Collateral, business operations or financial condition; and all computer programs, or tape files, and the equipment, containing such information.

"**Business Day**" means any day that is not a Saturday, Sunday, or other day on which banks in the State of Georgia are authorized or required to close.

"**Change in Control**" shall mean a transaction in which any "person" or "group" (within the meaning of Section 13(d) and 14(d)(2) of the Securities Exchange

Act of 1934) becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934), directly or indirectly, of a sufficient number of shares of all classes of stock then outstanding of Borrowers ordinarily entitled to vote in the election of directors or managers, empowering such "person" or "group" to elect a majority of the board of directors or managers of Borrowers, who did not have such power before such transaction.

"**Closing Date**" means the Effective Date.

"**Code**" means the Georgia Uniform Commercial Code.

"**Collateral**" means the property described on Exhibit A attached hereto.

"**Contingent Obligation**" means, as applied to any Person, any direct or indirect liability, contingent or otherwise, of that Person with respect to: (i) any indebtedness, lease, dividend, letter of credit or other obligation of another; (ii) any obligations with respect to undrawn letters of credit, corporate credit cards, or merchant services issued or provided for the account of that Person; and (iii) all obligations arising under any agreement or arrangement designed to protect such Person against fluctuation in interest rates, currency exchange rates or commodity prices; provided, however, that the term "Contingent Obligation" shall not include endorsements for collection or deposit in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determined amount of the primary obligation in respect of which such Contingent Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by Lender in good faith.

"**Copyrights**" means any and all copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work thereof.

"**Credit Extension**" means the Term Loan or any other extension of credit by Lender for the benefit of Borrowers hereunder.

"**Daily Balance**" means the amount of the Obligations owed at the end of a given day.

"**EBITDA**" means with respect to any period, an amount equal to (i) net income, plus (ii) interest expense, plus (iii) tax expense, plus (iv) depreciation and amortization expense, plus (v) non-recurring cash expenses resulting from severance expense, debt restructuring costs and restructuring fees, plus (vi) reasonable and customary transaction-related expenses, in each case of Borrowers and its Subsidiaries for such period on a consolidated basis in accordance with GAAP.

"**Equipment**" means all present and future machinery, equipment, tenant improvements, furniture, fixtures, vehicles, tools, parts and attachments in which Borrowers has any interest.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"**Event of Default**" has the meaning assigned in Article 8.

"**Excess Cash Flow**" calculated annually, means the amount derived from Borrowers' net income plus depreciation plus amortization plus any and all other non-cash charges and income less any changes in Borrowers' net working capital less any minimum cash reserves requirement minus any approved capital expenditures minus an amount estimated to be sufficient to enable all members of Borrowers to satisfy their federal and state income tax liability with respect to the income of Borrowers passed through to such member.

"**Extinguished Debt**" means the obligations of Borrowers owing to an Extinguished Lender.

"**Extinguished Lender**" means the owner of obligations owing by Borrowers as Extinguished Debt and paid off by Borrowers utilizing proceeds obtained by Borrowers from Lender pursuant to this Agreement.

"**GAAP**" means generally accepted accounting principles

"**Indebtedness**" means (i) all indebtedness for borrowed money or the deferred purchase price of property or services, including without limitation reimbursement and other obligations with respect to surety bonds and letters of credit, (ii) all obligations evidenced by notes, bonds, debentures or similar instruments, (iii) all capital lease obligations and (iv) all Contingent Obligations.

"**Insolvency Proceeding**" means any proceeding commenced by or against any person or entity under any provision of the United States Bankruptcy Code, as amended, or under any other bankruptcy or insolvency law, including assignments for the benefit of creditors, formal or informal moratoria, compositions, extension generally with its creditors, or proceedings seeking reorganization, arrangement, or other relief.

"**Intellectual Property Collateral**" means all of Borrowers' right, title, and interest in and to the following: Copyrights, Trademarks and Patents; all trade secrets, all design rights, claims for damages by way of past, present and future infringement of any of the rights included above, all licenses or other rights to use any of the Copyrights, Patents or Trademarks, and all license fees and royalties arising from such use to the extent permitted by such license or rights; all amendments, renewals and extensions of any of the Copyrights, Trademarks or Patents; and all proceeds and

products of the foregoing, including without limitation all payments under insurance or any indemnity or warranty payable in respect of any of the foregoing.

"**Inventory**" means all inventory in which Borrowers has or acquires any interest, including work in process and finished products intended for sale or lease or to be furnished under a contract of service, of every kind and description now or at any time hereafter owned by or in the custody or possession, actual or constructive, of Borrowers, including such inventory as is temporarily out of its custody or possession or in transit and including any returns upon any accounts or other proceeds, including insurance proceeds, resulting from the sale or disposition of any of the foregoing and any documents of title representing any of the above, and Borrowers' Books relating to any of the foregoing.

"**Investment**" means any beneficial ownership (including stock, partnership interest or other securities or equity interests) of any Person, or any investment, loan, advance or capital contribution or transfer of any assets through advances, equity positions or other avenues to any Person.

"**Lender Expenses**" means all: reasonable costs or expenses (including attorneys' fees and expenses) actually incurred in connection with the preparation, negotiation, administration, and enforcement of the Loan Documents; reasonable Collateral audit fees actually incurred; and Lender's reasonable attorneys' fees and expenses actually incurred in amending, enforcing or defending the Loan Documents (including fees and expenses of appeal), or actually incurred before, during and after an Insolvency Proceeding, whether or not suit is brought.

"**Lien**" means any mortgage, lien, deed of trust, charge, pledge, security interest or other encumbrance.

"**Loan Documents**" means, collectively, this Agreement, the Note, the Personal Guaranty, the Deed to Secure Debt and Assignment of Rents, , any note or notes, documents or instruments executed by Borrowers and any other document, instrument or agreement entered into in connection with this Agreement, all as amended or extended from time to time.

"**Material Adverse Effect**" means a material adverse effect on (i) the business operations or condition (financial or otherwise) of Borrowers and its Subsidiaries taken as a whole or (ii) the ability of Borrowers to repay the Obligations or otherwise perform its obligations under the Loan Documents or (iii) the value or priority of Lender's security interests in the Collateral.

"**Negotiable Collateral**" means all letters of credit of which Borrowers is a beneficiary, notes, drafts, instruments, securities, documents of title, and chattel paper, and Borrowers' Books relating to any of the foregoing.

"**Non-Operating Capital Expenditures**" means Borrowers expenditures related to office equipment, furniture, fixtures, intangible assets and vehicles.

"**Obligations**" means all debt, principal, interest, Lender Expenses and other amounts owed to Lender by Borrowers pursuant to this Agreement or any other agreement, whether absolute or contingent, due or to become due, now existing or hereafter arising, including any interest that accrues after the commencement of an Insolvency Proceeding and including any debt, liability, or obligation owing from Borrowers to others that Lender may have obtained by assignment or otherwise.

"**Operating Capital Expenditures**" mean Borrowers expenditures related to all buildings, land, machinery, computer equipment and software.

"**Patents**" means all patents, patent applications and like protections including without limitation improvements, divisions, continuations, renewals, reissues, extensions and continuations-in-part of the same.

"**Permitted Indebtedness**" means:

(a) Indebtedness of Borrowers in favor of Lender arising under this Agreement or any other Loan Document;

(b) Indebtedness (other than the Extinguished Debt) existing on the Closing Date and disclosed in the Schedule (the "**Prior Debt**");

(c) Indebtedness secured by a lien described in clause (c) of the defined term "**Permitted Liens**," provided (i) such Indebtedness does not exceed the lesser of the cost or fair market value of the equipment financed with such Indebtedness and (ii) such Indebtedness does not exceed at any time the aggregate amount outstanding as of the Closing Date;

(d) Indebtedness to trade creditors incurred in the ordinary course of business; and

(e) Subordinated Debt.

"**Permitted Investment**" means:

(a) Investments existing on the Closing Date disclosed in the Schedule, attached hereto and made a part hereof; and

(b) (i) marketable direct obligations issued or unconditionally guaranteed by the United States of America or any agency or any State thereof maturing within one (1) year from the date of acquisition thereof, (ii) commercial paper maturing no more than one (1) year from the date of creation thereof and currently having rating of at least A-2 or P-2 from either Standard & Poor's Corporation or Moody's Investors Service, (iii) certificates

of deposit maturing no more than one (1) year from the date of investment therein issued by Lender and (iv) Lender's money market accounts.

"**Permitted Liens**" means the following:

(a) Any Liens existing on the Closing Date and disclosed in the Schedule or arising under this Agreement or the other Loan Documents (other than Liens in favor of Extinguished Lenders that will be released following payment of the Extinguished Debt);

(b) Liens for taxes, fees, assessments or other governmental charges or levies, either not delinquent or being contested in good faith by appropriate proceedings;

(c) Liens (i) against any equipment acquired or held by Borrowers or any of its Subsidiaries and not financed by Lender, but only to the extent such liens secure the purchase price of such equipment or indebtedness incurred solely for the purpose of financing the acquisition of such equipment, or (ii) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment; and

(d) Liens incurred in connection with the extension, renewal or refinancing of the indebtedness secured by Liens of the type described in clauses (a) through (c) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the indebtedness being extended, renewed or refinanced does not increase.

"**Person**" means any individual, sole proprietorship, partnership, limited liability company, joint venture, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or governmental agency.

"**Responsible Officer**" means each of the Chief Executive Officer, the Chief Operating Officer, the Chief Financial Officer, the Chief Product Officer and the Controller of Borrowers.

"**Schedule**" means the schedule of exceptions attached hereto and made a part hereof and as may be amended from time to time, and approved by Lender, if any.

"**Subordinated Debt**" means any debt incurred by Borrowers (including any debt held by Borrowers' members, owners, family members, principals, employees or other non-institutional lenders) that is subordinated to the debt owing by Borrowers to Lender on terms acceptable to Lender in its reasonable discretion (and

identified as being such by Borrowers and Lender), pursuant to a subordination agreement in form and substance satisfactory to Lender.

"**Subsidiary**" means, as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries (including any Affiliate), or both, by such Person. Unless the context otherwise requires, each reference to a Subsidiary herein shall be a reference to a Subsidiary of Borrowers.

"**Term Loan Maturity Date**" has the meaning assigned in Section 2.1 (a) below.

"**Trademarks**" means any trademark and service mark rights, whether registered or not, applications to register and registrations of the same and like protections, and the entire goodwill of the business of Borrowers connected with and symbolized by such trademarks.

**1.2 Accounting Terms.** All accounting terms not specifically defined herein shall be construed in accordance with GAAP, and all calculations made hereunder shall be made in accordance with GAAP. When used herein, the terms "financial statements" shall include the notes and schedules thereto.

## 2. LOAN AND TERMS OF PAYMENT.

**2.1 Credit Extensions.** Borrowers promises to pay Lender, in lawful money of the United States of America, the aggregate unpaid principal amount of all Credit Extensions made by Lender to Borrowers hereunder. Borrowers shall also pay interest on the unpaid principal amount of such Credit Extensions at rates in accordance with the terms hereof.

### (a) Term Loan.

(i) Subject to and upon the terms and conditions of this Agreement, on or around the Closing Date, Lender shall make a cash advance to Borrowers totaling a principal amount of Three Million Five Hundred Thousand Dollars ($3,500,000.00) (collectively, the "**Term Loan**"), the proceeds of which shall be used to 1) directly pay off the existing $2,500,000 debt on The Frog golf course, and 2) to provide capital for renovations to The Frog golf course. The funds will be disbursed according to the following schedule:

| Recipients | Date | Amount |
|---|---|---|
| Compass Golf LLC and L & J Acquisitions LLC | March 17, 2023 | $3,500,000.00 |

(ii) Interest shall accrue on balances owed from the date such Tranche is dispersed to Borrowers (the "Funding Date") at the rate specified in Section 2.2 and shall be payable monthly on the fifteenth (15th) day of each month starting April 15, 2023, so long as any portion of the Term Loan is outstanding. The Term Loan Maturity shall be thirty (30) months from the Funding Date and all amounts owing under this Section 2.1 (including, for the avoidance of doubt, all principal and accrued interest outstanding as of such date) and any other amounts owing under this Agreement shall be immediately due and payable. The Term Loan, once repaid, may not be re-borrowed.

(iii) The Funding Date shall be on March 17, 2023 or the same business day this document has been notarized and signed by Borrowers, whichever comes second.

(iv) Upon providing Lender with at least five (5) Business Days' prior written notice, Borrowers shall have the option to prepay all or part of the Term Loan; provided, however, that on such date of prepayment, Borrowers shall pay (A) the outstanding principal amount owed under the Term Loan being repaid, plus (B) all accrued interest thereon pursuant to Section 2.2 below, plus (C) if such prepayment occurs within twelve (12) months of the Funding Date, the remainder of twelve (12) months of interest will be due, plus (D) all other sums, if any, that shall have become due and payable under the Loan Documents and that relate to the Term Loan.

**2.2 Interest Rates, Payments, and Calculations.**

**(a) Interest Rates.** Except as set forth in Section 2.2(b), the Term Loan shall bear simple interest on the principal amount at a per annum rate equal to sixteen percent (16.00%) calculated on the basis of a 360-day year.

**(b) Late Fee; Default Rate.** If any payment due under this Agreement is not made within one (1) business day after the date such payment is due, Borrowers shall pay Lender a late fee equal to the lesser of (i) ten percent (10%) of the amount of such unpaid installment amount or (ii) the maximum amount permitted to be charged under applicable law, but not in any case to be less than Twenty-Five and 00/100 Dollars ($25.00). All Obligations shall bear interest, from and after the occurrence and during the continuance of an Event of Default, at a rate equal to eight (8) percentage points above the interest rate applicable immediately prior to the occurrence of the Event of Default, to equal a default interest rate of twenty-four percent (24%).

**(c) Payment Schedule.**

(i)    For the period commencing on the fifteenth (15th) calendar day of the month starting April 15, 2023 and ending on September 15, 2024 (the "**First Payment Period**"), Borrowers shall pay to Lender eighteen (18) monthly installments of interest only payments based on the outstanding principal balance at that time. Such payments shall be due and payable on the fifteenth (15th) calendar day of each month during the First Payment Period.

(ii)    For the period commencing on the fifteenth (15th) calendar day of the month starting October 15, 2024 and ending on September 15, 2025 (the "**Second Payment Period**"), Borrowers shall pay to Lender equal monthly installments of principal equal to $291,666.67 (Two Hundred Ninety -One Thousand Six Hundred Sixty -Six and 67/100 Dollars) per month, plus continued interest based on the outstanding principal balance at that time. Such payments shall be due and payable on the fifteenth (15th) calendar day of each month during the Second Payment Period.

(iii)    All payments shall be free and clear of any taxes, withholdings, duties, impositions or other charges, to the end that Lender will receive the entire amount of any Obligations payable hereunder, regardless of source of payment.

**2.3 Crediting Payments.** Prior to the occurrence of an Event of Default, Lender shall credit a wire transfer of funds, check or other item of payment to such Obligation as Borrowers specifies. After the occurrence of an Event of Default, the receipt by Lender of any wire transfer of funds, check, or other item of payment shall be immediately applied to conditionally reduce Obligations, but shall not be considered a payment on account unless such payment is of immediately available federal funds or unless and until such check or other item of payment is honored when presented for payment. Notwithstanding anything to the contrary contained herein, any wire transfer or payment received by Lender after 12:00 noon Eastern time shall be deemed to have been received by Lender as of the opening of business on the immediately following Business Day. Whenever any payment to Lender under the Loan Documents would otherwise be due (except by reason of acceleration) on a date that is not a Business Day, such payment shall instead be due on the next Business Day, and additional fees or interest, as the case may be, shall accrue and be payable for the period of such extension.

**2.4 Fees and Expenses.** Borrowers shall pay to Lender on the Closing Date all Lender Expenses incurred through the Closing Date; provided that (i) Borrowers shall fund such payment from the Term Loan proceeds, with such amount being netted from the total received by Borrowers upon Closing, and (ii) such Lender Expenses, including reasonable attorneys' fees and expenses, shall not exceed Five Thousand

and 00/100 Dollars ($5,000). This is in addition to the Five Thousand and 00/100 Dollars ($5,000) deposit the Borrowers already paid.

**2.5 Term.** This Agreement shall become effective on the Closing Date and shall continue in full force and effect for so long as any Obligations remain outstanding under this Agreement.

**2.6 Origination Fee.** On the Closing Date, Borrowers shall pay to Lender an initial commitment fee equal to five and thirty-five one hundredths percent (5.35%) of the Term Loan (the "**Initial Commitment Fee**"). The Initial Commitment Fee will be netted out of the proceeds of the loan.

**2.7 Monthly Monitoring Fee.** As part of each month's loan payment, Five Hundred Dollars ($500.00) will be added to the payment as a monthly monitoring fee (the "**Monitoring Fee**"). There will be a minimum of twelve (12) months of the Monthly Monitoring Fee regardless of how early the Term Loan is paid off.

## 3. CONDITIONS OF LOAN.

**3.1 Conditions Precedent to Initial Credit Extension.** The obligation of Lender to make the initial Credit Extension is subject to the condition precedent that Lender shall have received, in form and substance satisfactory to Lender in its reasonable discretion, the following:

(a) this Agreement;

(b) signed copy of the Personal Guaranty;

(c) a signed copy of the Deed to Secure Debt and Assignment of Rents

(d) UCC National Form Financing Statement;

(e) such other documents, and completion of such other matters, as Lender may reasonably deem necessary or appropriate.

## 4. CREATION OF SECURITY INTEREST.

**4.1 Grant of Security Interest.** Borrowers grants and pledges to Lender a continuing security interest in all presently existing and hereafter acquired or arising Collateral in order to secure prompt repayment of any and all Obligations and in order to secure prompt performance by Borrowers of each of its covenants and duties under the Loan Documents. Such security interest constitutes a valid security interest in the presently existing Collateral and will constitute a valid security interest in Collateral acquired after the date hereof.

**4.2 Delivery of Additional Documentation Required.** Borrowers shall from time to time execute and deliver to Lender, at the request of Lender, all Negotiable Collateral, all financing statements and other documents that Lender may reasonably request, in form satisfactory to Lender in its reasonable discretion, to perfect and continue the perfection of Lender's security interests in the Collateral and in order to fully consummate all of the transactions contemplated under the Loan Documents. Borrowers from time to time may submit to Lender specific time deposit certificates to secure specific Obligations. Borrowers authorizes Lender to hold such time deposit certificates in pledge and to decline to honor any request by Borrowers or any other Person to return such certificates for so long as the Obligations are outstanding.

**4.3 Right to Inspect.** Lender (through any of its officers, employees, or agents) shall have the right, upon reasonable prior notice, from time to time during Borrowers' usual business hours but no more than once a year (unless an Event of Default has occurred and is continuing), to inspect Borrowers' Books and to make copies thereof and to check, test, and appraise the Collateral in order to verify Borrowers' financial condition or the amount, condition of, or any other matter relating to, the Collateral.

## 5. REPRESENTATIONS AND WARRANTIES

Borrowers represents and warrants as follows:

**5.1 Due Organization and Qualification**.

**Compass Golf LLC**. Compass Golf LLC is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Georgia and is duly qualified to do business, and is in good standing, in every jurisdiction where the nature of its business requires it to be so qualified.

**(a) L & J Acquisitions LLC**. L & J Acquisitions LLC is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Wyoming and is duly qualified to do business, and is in good standing, in every jurisdiction where the nature of its business requires it to be so qualified

**5.2 Due Authorization; No Conflict.** The execution, delivery, and performance of the Loan Documents are within Borrowers' powers, have been duly authorized, and are not in conflict with nor constitute a breach of any agreement to which Borrowers are bound, nor will they constitute an event of default under any agreement to which Borrowers are a party or by which Borrowers are bound. Borrowers are not in default under any material agreement to which either Borrowers is a party or by which either Borrowers is bound that could result in a Material Adverse Effect.

**5.3 No Prior Encumbrances; No Undisclosed Liabilities.** Compass Golf LLC has good and marketable title to its property, free and clear of Liens, except for Permitted Liens. Borrowers have no debts or liabilities with respect to their respective businesses, except those that are (i) adequately reflected on its financial statements, and (ii) those which have been incurred in the ordinary course of business consistent with past practice and which are not, individually or in the aggregate, material in amount.

**5.4 Names; Locations.** Except as disclosed in the Schedule, Borrowers have not done business under any name other than that specified on the signature page hereof. The principal office of Borrowers is located at the address indicated in Section 10 hereof. All of Borrowers' Inventory and Equipment is located only at the location set forth in Section 10 hereof.

**5.5 Litigation.** Except as set forth in the Schedule, there are no actions or proceedings pending against Borrowers or any Subsidiary before any court or administrative agency that could reasonably be expected to result in liabilities in excess of Ten Thousand and 00/100 Dollars ($10,000) or in which an adverse decision could have a Material Adverse Effect, or a material adverse effect on Borrowers' interest or Lender's security interest in the Collateral.

**5.6 No Material Adverse Change in Financial Statements.** All consolidated financial statements related to Borrowers and any Subsidiary that Lender has received from Borrowers fairly present in all material respects Borrowers' financial condition as of the date thereof and Borrowers' consolidated results of operations for the period then ended. There has not been a material adverse change in the consolidated financial condition of Borrowers since the date of the most recent of such financial statements submitted to Lender.

**5.7 Solvency, Payment of Debts.** Borrowers are solvent and able to pay their debts (including trade debts) as they mature.

**5.8 Regulatory Compliance.** Borrowers and each Subsidiary have met the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA, and no event has occurred resulting from Borrowers' failure to comply with ERISA that could result in Borrowers' incurring any material liability. Neither Borrowers is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940. Borrowers are not engaged principally, or as one of the important activities, in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulations T and U of the Board of Governors of the Federal Reserve System). Borrowers have complied with all the provisions of the Federal Fair Labor Standards Act. Borrowers have not violated any statutes, laws, ordinances or rules applicable to it, the violation of which could have a Material Adverse Effect.

**5.9 Taxes.** Borrowers and each Subsidiary have filed or caused to be filed all tax returns required to be filed, and have paid, or have made adequate provision for the payment of, all taxes reflected therein.

**5.10 Capitalization; Subsidiaries.** The issued and outstanding units or membership interests of Borrowers are accurately reflected in the business records of Borrowers. Except as set forth in the Schedule or as issued herein to Lender and any affiliate of Lender, there are no warrants, options or other agreement for the issuance of any additional units or membership interests to any third party. Borrowers do not own any stock, partnership interest or other equity securities of any Person, except for Permitted Investments.

**5.11 Government Consents.** Borrowers and each Subsidiary have obtained all material consents, approvals and authorizations of, made all declarations or filings with, and given all notices to, all governmental authorities that are necessary for the continued operation of Borrowers' business as currently conducted.

**5.12 Full Disclosure.** No representation, warranty or other statement made by Borrowers in any certificate or written statement furnished to Lender contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained in such certificates or statements not misleading.

## 6. AFFIRMATIVE COVENANTS.

Borrowers shall do all of the following:

**6.1 Good Standing.** Each of the Borrowers shall maintain its and each of its Subsidiary's existence and good standing in their jurisdiction of formation and maintain qualification in each jurisdiction in which they are required under applicable law, other than those jurisdictions in which a failure to be so qualified could not reasonably be expected to have a Material Adverse Effect. Borrowers shall maintain, and shall cause each of its Subsidiaries to maintain, in force all licenses, approvals and agreements, the loss of which could have a Material Adverse Effect.

**6.2 Government Compliance.** Each of the Borrowers shall meet, and shall cause each Subsidiary to meet, the minimum funding requirements of ERISA with respect to any employee benefit plans subject to ERISA. Each of the Borrowers shall comply, and shall cause each Subsidiary to comply, with all statutes, laws, ordinances and government rules and regulations to which it is subject, noncompliance with which could have a Material Adverse Effect.

**6.3 Financial Statements, Reports, Certificates.** Borrowers shall deliver the following to Lender: (a) as soon as available, but in any event within forty-five (45) days after the end of each calendar year beginning with the year ended December 31, 2022, a consolidated balance sheet, income statement, and cash flow statement covering Borrowers' consolidated operations during such annual period, prepared in

77764042.1

Exhibit D - Page 14

accordance with GAAP, consistently applied, (b) as soon as available, but in any event within thirty (30) days after the end of each calendar quarter (other than a calendar quarter ending December 31), beginning with the calendar quarter ending March 31, 2023, a company prepared consolidated balance sheet, income statement, and cash flow statement covering Borrowers' consolidated operations during such quarterly period, in a form acceptable to Lender and certified by Borrowers; (c) as soon as available, but in any event within fifteen (15) days after the end of each calendar month (other than a calendar month ending December 31), beginning with the calendar quarter ending March 31, 2023, a company prepared consolidated balance sheet, income statement, and cash flow statement and bank statements covering Borrowers' consolidated operations during such monthly period, in a form acceptable to Lender and certified by Borrowers; (d) promptly upon receipt of notice thereof, a report of any legal actions pending or threatened against Borrowers; (e) such budgets, sales projections, operating plans or other financial information as Lender may reasonably request from time to time; and (f) as soon as available, but in any event within forty-five (45) days after the end of each calendar quarter beginning with the calendar quarter ending March 31, 2023, a quarterly variance report setting forth actual quarterly earnings compared to projected quarterly earnings.

**6.4 Inventory; Returns.** Borrowers shall keep all Inventory and equipment in good and marketable condition, free from all material defects.

**6.5 Taxes.** Borrowers shall make, and shall cause each Subsidiary to make, due and timely payment or deposit of all material federal, state, and local taxes, assessments, or contributions required of it by law, and will execute and deliver to Lender, on demand, appropriate certificates attesting to the payment or deposit thereof; and Borrowers will make, and will cause each Subsidiary to make, timely payment or deposit of all material tax payments and withholding taxes required of it by applicable laws, including, but not limited to, those laws concerning F.I.C.A., F.U.T.A., state disability, and local, state, and federal income taxes, and will, upon request, furnish Lender with proof satisfactory to Lender indicating that Borrowers or a Subsidiary has made such payments or deposits; provided that Borrowers or a Subsidiary need not make any payment if the amount or validity of such payment is contested in good faith by appropriate proceedings and is reserved against (to the extent required by GAAP) by Borrowers.

**6.6 Insurance.**

(a) Borrowers, at their expense, shall keep the Collateral insured against loss or damage by fire, theft, explosion, sprinklers, and all other hazards and risks as ordinarily insured against by other owners in similar businesses conducted in the locations where Borrowers' business is conducted on the date hereof. Borrowers shall also maintain insurance relating to Borrowers' business, ownership and use of the Collateral in amounts and of a type that are customary to businesses similar to Borrowers.

(b) All such policies of insurance shall be in such form, with such companies, and in such amounts as are reasonably satisfactory to Lender. All such policies of property insurance shall contain a lender's loss payable endorsement, in a form satisfactory to Lender, showing Lender as an additional loss payee thereof, and all liability insurance policies shall show the Lender as an additional insured and shall specify that the insurer must give at least twenty (20) days' notice to Lender before canceling its policy for any reason. Upon Lender's request, Borrowers shall deliver to Lender copies of such policies of insurance and evidence of the payments of all premiums therefor. All proceeds payable under any such policy shall, at the option of Lender, be payable to Lender to be applied on account of the Obligations.

**6.7 Intellectual Property Rights.**

(a) Borrowers shall promptly give Lender written notice of any applications or registrations of intellectual property rights filed with the United States Patent and Trademark Office, including the date of such filing and the registration or application numbers, if any.

(b) Borrowers shall (i) give Lender not less than thirty (30) days' prior written notice of the filing of any applications or registrations with the United States Copyright Office, including the title of such intellectual property rights to be registered, as such title will appear on such applications or registrations, and the date such applications or registrations will be filed, and (ii) prior to the filing of any such applications or registrations, shall execute such documents as Lender may reasonably request for Lender to maintain its perfection in such intellectual property rights to be registered by Borrowers, and upon the request of Lender, shall file such documents simultaneously with the filing of any such applications or registrations. Upon filing any such applications or registrations with the United States Copyright Office, Borrowers shall promptly provide Lender with (i) a copy of such applications or registrations, without the exhibits, if any, thereto, (ii) evidence of the filing of any documents requested by Lender to be filed for Lender to maintain the perfection and priority of its security interest in such intellectual property rights, and (iii) the date of such filing.

(c) Lender may audit Borrowers' Intellectual Property Collateral to confirm compliance with this Section, provided such audit may not occur more often than once per year, unless an Event of Default has occurred and is continuing. Lender shall have the right, but not the obligation, to take, at Borrowers' sole expense, any actions that Borrowers is required under this Section to take but which Borrowers fail to take after fifteen (15) days' notice from Lender to Borrowers. Borrowers shall reimburse and indemnify Lender for all reasonable costs and reasonable expenses incurred in the reasonable exercise of its rights under this Section.

**6.8 Formation or Acquisition of Subsidiaries.** Notwithstanding and without limiting the negative covenants contained in <u>Section 7.3</u> and <u>Section 7.7</u> hereof, at the time that each Borrower formd any direct or indirect Subsidiary or acquires any

direct or indirect Subsidiary, each Borrower shall (a) cause such new Subsidiary to provide to Lender a joinder to this Agreement to cause such Subsidiary to become a co-Borrower hereunder, together with such appropriate financing statements and/or control agreements, all in form and substance satisfactory to Lender (including being sufficient to grant Lender a first priority Lien (subject to Permitted Liens) in and to the assets of such newly formed or acquired Subsidiary), (b) provide to Lender appropriate certificates and powers and financing statements, pledging all of the direct or beneficial ownership interest in such new Subsidiary, in form and substance satisfactory to Lender, and (c) provide to Lender all other documentation in form and substance satisfactory to Lender that in its opinion is appropriate with respect to the execution and delivery of the applicable documentation referred to above.

**6.9 Notices of Commercial Tort Claims; Event of Default.** Without limiting or contradicting any other more specific provision of this Agreement, promptly (and in any event within three (3) Business Days) upon Borrowers becoming aware of the existence of any Event of Default or event described in <u>Section 8</u> which, with the giving of notice or passage of time, or both, would constitute an Event of Default, Borrowers shall give written notice to Lender of such occurrence, which such notice shall include a reasonably detailed description of such Event of Default or event which, with the giving of notice or passage of time, or both, would constitute an Event of Default. If Borrowers shall acquire a commercial tort claim (as defined in the Code) in excess of Fifty Thousand and 00/100 Dollars ($50,000), Borrowers shall promptly notify Lender in writing of the general details thereof and grant to the Lender in such writing a security interest therein and in the proceeds thereof, all upon the terms of this Agreement, with such writing to be in form and substance reasonably satisfactory to the Lender.

**6.10 Further Assurances.** At any time and from time to time Borrowers shall execute and deliver such further instruments and take such further action as may reasonably be requested by Lender to effect the purposes of this Agreement.

## 7. NEGATIVE COVENANTS.

Unless approved by Lender in writing on a case-by-case basis, Borrowers will not do any of the following:

**7.1 Dispositions.** Convey, sell, lease, transfer or otherwise dispose of (collectively, a "**<u>Transfer</u>**"), or permit any of its Subsidiaries to Transfer, all or any part of its business or property, other than: (i) transfers of Inventory in the ordinary course of business; or (ii) transfers of worn-out or obsolete Equipment that was not financed by Lender.

**7.2 Change in Business or Executive Office.** Engage in any business, or permit any of its Subsidiaries to engage in any business, other than the businesses currently engaged in by Borrowers and any business substantially similar or related thereto (or incidental thereto); cease to conduct business in the manner conducted

by Borrowers as of the Closing Date; or without thirty (30) days' prior written notification to Lender, relocate its principal office or state of formation or change its legal name; or without Lender's prior written consent, change the date on which its fiscal year ends.

**7.3 Change in Control; Mergers or Acquisitions.** Suffer or permit a Change in Control; or merge or consolidate, or permit any of its Subsidiaries to merge or consolidate, with or into any other business organization, or acquire, or permit any of its Subsidiaries to acquire, all or substantially all of the units, capital stock, other equity interests or any material portion of property of another Person; provided however, only advance written notice to the Lender will be required for any action restricted by this Section 7.3 if all Obligations are paid in full in cash out of the proceeds of the initial closing of such action and such payment is listed as a condition to the consummation of such action.

**7.4 Indebtedness.** Create, incur, assume or be or remain liable with respect to any Indebtedness, or permit any Subsidiary so to do, unless that indebtedness is disclosed to the Lender via email or in writing.

**7.5 Encumbrances.** Create, incur, assume or suffer to exist any Lien with respect to any of its property (including without limitation, its Intellectual Property Collateral), or assign or otherwise convey any right to receive income, including the sale of any Accounts, or permit any of its Subsidiaries to do so, or agree with any Person other than Lender not to grant a security interest in, or otherwise encumber, any of its property (including without limitation, its Intellectual Property Collateral), or permit any Subsidiary to do so, unless that encumbrance is disclosed to the Lender via email or in writing.

**7.6 Investments.** Directly or indirectly acquire or own, or make any Investment in or to any Person, or permit any of its Subsidiaries so to do, other than Permitted Investments; or maintain or invest any of its property with a Person other than Lender or permit any of its Subsidiaries to do so unless such Person has entered into an account control agreement with Lender in form and substance satisfactory to Lender; or suffer or permit any Subsidiary to be a party to, or be bound by, an agreement that restricts such Subsidiary from paying dividends or otherwise distributing property to Borrowers.

**7.7 Transactions with Affiliates.** Directly or indirectly enter into or permit to exist any material transaction with any Affiliate of Borrowers except for transactions that are in the ordinary course of Borrowers' business, upon fair and reasonable terms that are no less favorable to Borrowers than would be obtained in an arm's length transaction with a nonaffiliated Person.

**7.8 Compliance.** Become an "investment company" or be controlled by an "investment company," within the meaning of the Investment Company Act of 1940, or become principally engaged in, or undertake as one of its important activities, the

business of extending credit for the purpose of purchasing or carrying margin stock, or use the proceeds of any Credit Extension for such purpose. Fail to meet the minimum funding requirements of ERISA, permit a Reportable Event or Prohibited Transaction, as defined in ERISA, to occur, fail to comply with the Federal Fair Labor Standards Act or violate any law or regulation, which violation could have a Material Adverse Effect, or a material adverse effect on the Collateral or the priority of Lender's Lien on the Collateral, or permit any of its Subsidiaries to do any of the foregoing.

**7.9 Operating Capital Expenditures.** Make or contract to make, without Lender's prior written consent, Operating Capital Expenditures in any fiscal year in excess of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000) per transaction.

**7.10 Non-Operating Capital Expenditures.** Make or contract to make, without Lender's prior written consent, Non-Operating Capital Expenditures in any fiscal year in excess of Two Hundred Fifty Thousand and 00/100 Dollars ($250,000) per transaction.

## 8. EVENTS OF DEFAULT.

Any one or more of the following events shall constitute an Event of Default by Borrowers under this Agreement:

**8.1 Payment Default.** If Borrowers fail to pay, when due, any of the Obligations (a "**Payment Default**"). In the event of a Payment Default, Lender will provide a Notice of Default to Borrowers and will provide a ten (10) day cure period from the date Borrowers receive such notice. Notice shall be deemed received by Borrowers according to Section 10 of this Agreement.

**8.2 Covenant Default.**

(a) If Borrowers fail to perform any obligation under Article 6 or violates any of the covenants contained in Article 7 of this Agreement; or

(b) If Borrowers fail or neglect to perform or observe any obligation under any other material term, provision, condition, or covenant contained in this Agreement, in any of the Loan Documents, or in any other present or future agreement between Borrowers and Lender, and as to any default under such other term, provision, condition or covenant that can be cured, have failed to cure such default within ten (10) days after Borrowers receive notice thereof or any officer of Borrowers becomes aware thereof; provided, however, that if the default cannot by its nature be cured within the ten (10) day period or cannot after diligent attempts by Borrowers be cured within such ten (10) day period, and such default is likely to be cured within a reasonable time, then Borrowers shall have an additional reasonable period (which shall not in any case exceed thirty (30) days) to attempt to cure such default, and within such reasonable time period the failure to have cured

such default shall not be deemed an Event of Default but no Credit Extensions will be made.

**8.3 Material Adverse Effect.** If there occurs any circumstance or circumstances that reasonably could have a Material Adverse Effect.

**8.4 Attachment.** If any portion of Borrowers' assets is attached, seized, subjected to a writ or distress warrant, or is levied upon, or comes into the possession of any trustee, receiver or person acting in a similar capacity and such attachment, seizure, writ or distress warrant or levy has not been removed, discharged or rescinded within ten (10) days, or if either Borrower is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, or if a judgment or other claim becomes a lien or encumbrance upon any portion of Borrowers' assets with a value in excess of Fifty Thousand and 00/100 Dollars ($50,000), or if a notice of lien, levy, or assessment is filed of record with respect to any of Borrowers' assets by the United States Government, or any department, agency, or instrumentality thereof, or by any state, county, municipal, or governmental agency, and the same is not paid within ten (10) days after Borrowers receive notice thereof, provided that none of the foregoing shall constitute an Event of Default where such action or event is stayed or an adequate bond has been posted pending a good faith contest by Borrowers (provided that no Credit Extensions will be required to be made during such cure period).

**8.5 Insolvency.** If either Borrower becomes insolvent, or if either Borrower commences an Insolvency Proceeding, or if an Insolvency Proceeding is commenced against either Borrower and is not dismissed or stayed within thirty (30) days (provided that no Credit Extensions will be made prior to the dismissal of such Insolvency Proceeding).

**8.6 Other Agreements.** If there is a default or other failure to perform in any agreement to which either Borrower is a party or by which either Borrower is bound resulting in a right by a third party or parties, whether or not exercised, to accelerate the maturity of any Indebtedness associated with such agreement in an amount in excess of Fifty Thousand and 00/100 Dollars ($50,000) or which reasonably could have a Material Adverse Effect.

**8.7 Judgments; Settlements; Fines; Penalties.** If a judgment or judgments for the payment of money in an amount, individually or in the aggregate, of at least Fifty Thousand and 00/100 Dollars (510,000) shall be rendered against either Borrower, or if either Borrower enters into any settlement agreement with respect to any litigation matters that results in payment obligations or liabilities incurred by either Borrower in excess of Fifty Thousand and 00/100 Dollars ($50,000); or if one or more fines, penalties or orders or decrees for the payment of money in excess of Fifty Thousand and 00/100 Dollars ($50,000) shall be rendered against either Borrower by any governmental authority; and the foregoing shall remain unsatisfied and unstayed for a period of ten (10) days (provided that no Credit Extensions will

be made prior to the satisfaction or stay of such judgment, settlement, fine, penalty or orders or decree).

**8.8 Cross Default.** If there is a default or other failure to perform by Borrowers in any of the other Loan Documents.

**8.9 Misrepresentations.** If any material misrepresentation or material misstatement exists now or hereafter in any warranty or representation set forth herein or in any certificate delivered to Lender by any Responsible Officer pursuant to this Agreement or to induce Lender to enter into this Agreement or any other Loan Document.

## 9. LENDER'S RIGHTS AND REMEDIES.

**9.1 Rights and Remedies.** Upon the occurrence and during the continuance of an Event of Default, Lender may, at its election, without notice of its election and without demand, do any one or more of the following, all of which are authorized by Borrowers:

(a) Declare all or any portion of Obligations, whether evidenced by this Agreement, by any of the other Loan Documents, or otherwise, immediately due and payable (provided that upon the occurrence of an Event of Default described in Section 8.5, all Obligations shall become immediately due and payable without any action by Lender);

(b) Cease advancing money or extending credit to or for the benefit of Borrowers under this Agreement or under any other agreement between Borrowers and Lender;

(c) Settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that Lender reasonably considers advisable;

(d) Make such payments and do such acts as Lender considers necessary or reasonable to protect its security interest in the Collateral. Borrowers agree to assemble the Collateral if Lender so requires, and to make the Collateral available to Lender as Lender may designate. Borrowers authorize Lender to enter the premises where the Collateral is located, to take and maintain possession of the Collateral, or any part of it, and to pay, purchase, contest, or compromise any encumbrance, charge, or lien which in Lender's determination appears to be prior or superior to its security interest and to pay all expenses incurred in connection therewith. With respect to any of Borrowers' owned premises, Borrowers hereby grant Lender a license to enter into possession of such premises and to occupy the same, without charge, in order to exercise any of Lender's rights or remedies provided herein, at law, in equity, or otherwise;

(e) Set off and apply to the Obligations any and all (i) balances and deposits of Borrowers held by Lender, or (ii) indebtedness at any time owing to or for the credit or the account of Borrowers held by Lender;

(f) Ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell (in the manner provided for herein) the Collateral. Lender is hereby granted a license or other right, solely pursuant to the provisions of this Section 9.1, to use, without charge, each Borrower's labels, patents, copyrights, rights of use of any name, trade secrets, trade names, trademarks, service marks, and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with Lender's exercise of its rights under this Section 9.1, each Borrower's rights under all licenses and all franchise agreements shall inure to Lender's benefit;

(g) Dispose of the Collateral by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including each Borrower's premises) as Lender determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order Lender deems appropriate;

(h) Lender may credit bid and purchase at any public sale; and

(i) Any deficiency that exists after disposition of the Collateral as provided above will be paid immediately by Borrowers.

**9.2 Power of Attorney.** Effective only upon the occurrence and during the continuance of an Event of Default, and after Borrowers' failure to cure such Event of Default within the allowed cure period, each Borrower hereby irrevocably appoints Lender (and any of Lender's designated officers, or employees) as such Borrower's true and lawful attorney to: (a) send requests for verification of Accounts or notify account debtors of Lender's security interest in the Accounts; (b) endorse Borrower's name on any checks or other forms of payment or security that may come into Lender's possession; (c) sign Borrower's name on any invoice or bill of lading relating to any Account, drafts against account debtors, schedules and assignments of Accounts, verifications of Accounts, and notices to account debtors; (d) dispose of any Collateral; (e) make, settle, and adjust all claims under and decisions with respect to Borrower'' policies of insurance; (f) settle and adjust disputes and claims respecting the accounts directly with account debtors, for amounts and upon terms which Lender determines to be reasonable; and (g) whether or not an Event of Default has occurred that is continuing, to file, in its sole discretion, one or more financing or continuation statements and amendments thereto, relative to any of the Collateral. The appointment of Lender as each Borrower's attorney in fact, and each and every one of Lender's rights and powers, being coupled with an interest, is irrevocable until all of the Obligations have been fully repaid and performed and Lender's obligation to provide Credit Extensions hereunder is terminated.

**9.3 Accounts Collection.** At any time after the occurrence and during the continuance of an Event of Default, Lender may notify any Person owing funds to

Borrowers of Lender's security interest in such funds and verify the amount of such Account. Borrowers shall collect all amounts owing to Borrowers for Lender, receive in trust all payments as Lender's trustee, and immediately deliver such payments to Lender in their original form as received from the account debtor, with proper endorsements for deposit.

**9.4 Lender Expenses.** If Borrowers fail to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then Lender may do any or all of the following: (i) make payment of the same or any part thereof; (ii) set up such reserves under a loan facility in Section 2.1 as Lender deems necessary to protect Lender from the exposure created by such failure; (iii) obtain and maintain insurance policies of the type discussed in Section 6.6 of this Agreement, and take any action with respect to such policies as Lender deems prudent; or (iv) any expenses incurred by Lender to enforce terms of this Agreement. Any amounts so paid or deposited by Lender shall constitute Lender Expenses, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided, and shall be secured by the Collateral. Any payments made by Lender shall not constitute an agreement by Lender to make similar payments in the future or a waiver by Lender of any Event of Default under this Agreement. In the event of litigation or other attorney action to collect the Note, Lender shall be entitled to its actually incurred attorney's fees from Borrowers. Such attorney fees shall be as actually incurred and not any statutory presumption regarding attorney's fees found at O.C.G.A. 13-1-11 or otherwise.

**9.5 Lender's Liability for Collateral.** So long as Lender complies with reasonable practices, Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral; (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause; (iii) any diminution in the value thereof; or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other person whomsoever. Borrowers shall bear all risk of loss, damage or destruction of the Collateral.

**9.6 Remedies Cumulative.** Lender's rights and remedies under this Agreement, the Loan Documents, and all other agreements shall be cumulative. Lender shall have all other rights and remedies not inconsistent herewith as provided under the Code, by law, or in equity. No exercise by Lender of one right or remedy shall be deemed an election, and no waiver by Lender of any Event of Default on Borrowers' part shall be deemed a continuing waiver. No delay by Lender shall constitute a waiver, election, or acquiescence by it. No waiver by Lender shall be effective unless made in a written document signed on behalf of Lender and then shall be effective only in the specific instance and for the specific purpose for which it was given.

**9.7 Demand; Protest.** Borrowers waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, notice of any default, nonpayment at maturity, release, compromise, settlement, extension, or

renewal of accounts, documents, instruments, chattel paper, and guarantees at any time held by Lender on which Borrowers may in any way be liable.

## 10. NOTICES.

All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement or any other Loan Document must be in writing and shall be deemed to have been validly served, given, or delivered: (a) upon the earlier of actual receipt and three (3) Business Days after deposit in the U.S. mail, first class, registered or certified mail return receipt requested, with proper postage prepaid; (b) upon transmission, when sent by electronic mail or facsimile transmission; (c) one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid; or (d) when delivered, if hand-delivered by messenger, all of which shall be addressed to the party to be notified and sent to the address, facsimile number, or email address indicated below. Lender or Borrowers may change its or electronic mail address or facsimile number by giving the other party written notice thereof in accordance with the terms of this <u>Section 10</u>.

If to Borrowers:      Compass Golf LLC and L & J Acquisitions LLC
3254 Clubside View Ct
Snellville, GA 30039
EMAIL: jm@l-jgolf.com

If to Lender:      U.S. STRATEGIC CAPITAL ADVISORS LLC
2604 Abbey Court
Alpharetta, Georgia 30004
EMAIL: derekc@usstrategiccapital.com

The parties hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other.

## 11. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER.

This Agreement and all other Loan Documents (except as otherwise expressly provided in any of the Loan Documents) shall be governed by, and construed in accordance with, the internal laws of the State of Georgia, without regard to principles of conflicts of law. Each of Borrowers and Lender hereby submit to the exclusive jurisdiction of the state and Federal courts located in the County of Fulton, State of Georgia. BORROWERS AND LENDER EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF ANY OF THE LOAN DOCUMENTS OR ANY OF THE TRANSACTIONS CONTEMPLATED THEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY. EACH PARTY RECOGNIZES AND AGREES THAT THE FOREGOING WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR IT TO ENTER INTO THIS AGREEMENT. EACH PARTY REPRESENTS AND WARRANTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS

LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

**12. GENERAL PROVISIONS.**

   **12.1 Successors and Assigns.** This Agreement shall bind and inure to the benefit of the respective successors and permitted assigns of each of the parties; provided, however, that neither this Agreement nor any rights hereunder may be assigned by Borrowers without Lender's prior written consent, which consent may be granted or withheld in Lender's sole discretion. Lender shall have the right, upon notice to Borrowers, to sell, transfer, negotiate, or grant participation in all or any part of, or any interest in, Lender's obligations, rights and benefits hereunder.

   **12.2 Indemnification.** Borrowers shall defend, indemnify and hold harmless Lender and its officers, employees, and agents against: (i) all obligations, demands, claims, and liabilities claimed or asserted by any other party in connection with the transactions contemplated by this Agreement; and (ii) all losses or Lender Expenses in any way suffered, incurred, or paid by Lender as a result of or in any way arising out of, following, or consequential to the transactions between Lender and Borrowers whether under this Agreement, or otherwise (including without limitation reasonable attorneys' fees and expenses), except for losses caused by Lender's gross negligence or willful misconduct.

   **12.3 Time of Essence.** Time is of the essence for the performance of all obligations set forth in this Agreement.

   **12.4 Severability of Provisions.** Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

   **12.5 Amendments in Writing, Integration**. Neither this Agreement nor the Loan Documents can be amended or terminated orally. All prior agreements, understandings, representations, warranties, and negotiations between the parties hereto with respect to the subject matter of this Agreement and the Loan Documents, if any, are merged into this Agreement and the Loan Documents.

   **12.6 Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. This Agreement may be executed and delivered in counterpart signature pages executed and delivered via e-mail or facsimile transmission, and any such counterpart executed and delivered via e-mail or facsimile transmission shall be deemed an original for all intents and purposes.

**12.7  Survival.** All covenants, representations and warranties made in this Agreement shall continue in full force and effect so long as any Obligations remain outstanding, or Lender has any obligation to make Credit Extensions to Borrowers. The obligations of Borrowers to indemnify Lender with respect to the expenses, damages, losses, costs and liabilities shall survive until all applicable statute of limitations periods with respect to actions that may be brought against Lender have run.

**12.8 Confidentiality.** In handling any confidential information Lender and all employees and agents of Lender, including but not limited to accountants, shall exercise the same degree of care that it exercises with respect to its own proprietary information of the same types to maintain the confidentiality of any non-public information thereby received or received pursuant to this Agreement except that disclosure of such information may be made (i) to the subsidiaries or affiliates of Lender in connection with their present or prospective business relations with Borrowers, (ii) to prospective transferees or purchasers of any interest in the Credit Extensions, (iii) as required by law, regulations, rule or order, subpoena, judicial order or similar order, (iv) as may be required in connection with the examination, audit or similar investigation of Lender and (v) as Lender may determine in connection with the enforcement of any remedies hereunder. Confidential information hereunder shall not include information that either: (a) is in the public domain or in the knowledge or possession of Lender when disclosed to Lender, or becomes part of the public domain after disclosure to Lender through no fault of Lender; or (b) is disclosed to Lender by a third party, provided Lender does not have actual knowledge that such third party is prohibited from disclosing such information.

**12.9 Patriot Act Notice.** Lender hereby notifies Borrowers that, pursuant to the requirements of the USA Patriot Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies the Borrowers, which information includes names and addresses and other information that will allow Lender, as applicable, to identify the Borrowers in accordance with the Patriot Act.

**13. NOTICE OF FINAL AGREEMENT.**

BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS WRITTEN AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, (B) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (C) THIS WRITTEN AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under Seal as of the Effective Date.

**BORROWER:**

**Compass Golf LLC**

Signed, sealed and delivered
In the presence of:

Name: Jorge Martinez
Title: Owner, Compass Golf LLC

Notary Public

My commission expires:
DIOSA SANTOS
Commission # HH 329442
Expires November 6, 2026

**BORROWER:**

**L&J Acquisitions LLC**

Signed, sealed and delivered
In the presence of:

Name: Jorge Martinez
Title: Owner, L&J Acquisitions LLC

Notary Public

My commission expires:
DIOSA SANTOS
Commission # HH 329442
Expires November 6, 2026

**LENDER:**

**US Strategic Capital Advisors, LLC**

Signed, sealed and delivered
In the presence of:

By: _____
Name: Derek Cunningham
Title:  Managing Member

Notary Public

My commission expires:

77764042.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under Seal as of the Effective Date.

**BORROWER:**

**Compass Golf LLC**

Name: Jorge Martinez
Title: Owner, Compass Golf LLC

Signed, sealed and delivered
In the presence of:

Notary Public

My commission expires:

DIOSA SANTOS
Commission # HH 329442
Expires November 6, 2026

**BORROWER:**

**L&J Acquisitions LLC**

Name: Jorge Martinez
Title: Owner, L&J Acquisitions LLC

Signed, sealed and delivered
In the presence of:

Notary Public

My commission expires:

DIOSA SANTOS
Commission # HH 329442
Expires November 6, 2026

**LENDER:**

**US Strategic Capital Advisors, LLC**

By:
Name: Derek Cunningham
Title:  Managing Member

Signed, sealed and delivered
In the presence of:

Notary Public

My commission expires:

7/7/23

77764042.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed under Seal as of the Effective Date.

**BORROWER:**

**Compass Golf LLC**

Signed, sealed and delivered
In the presence of:

Name: Jorge Martinez
Title: Owner, Compass Golf LLC

Notary Public

My commission expires:

DIOSA SANTOS
Commission # HH 329442
Expires November 6, 2026

**BORROWER:**

**L&J Acquisitions LLC**

Signed, sealed and delivered
In the presence of:

Name: Jorge Martinez
Title: Owner, L&J Acquisitions LLC

Notary Public

My commission expires:

DIOSA SANTOS
Commission # HH 329442
Expires November 6, 2026

**LENDER:**

**US Strategic Capital Advisors, LLC**

Signed, sealed and delivered
In the presence of:

By:
Name: Derek Cunningham
Title:   Managing Member

Notary Public

My commission expires:

7/7/23

CHRISTOPHER LEE
NOTARY
EXPIRES
GEORGIA
July 7, 2023
PUBLIC
CHEROKEE COUNTY

77764042.1

**EXHIBIT A**

**DEBTOR:**          **Compass Golf LLC and L & J Acquisitions LLC**

**SECURED PARTY:    U.S. STRATEGIC CAPITAL ADVISORS LLC**

**COLLATERAL DESCRIPTION ATTACHMENT**
**TO LOAN AND SECURITY AGREEMENT**

All property of Borrowers (herein referred to as **"Borrowers"** or "**Debtors**"), with the exception of real property, whether presently existing or hereafter created or acquired, and wherever located, including, but not limited to:

(a) all accounts, chattel paper (including tangible and electronic chattel paper), commercial tort claims, deposit accounts, documents (including negotiable documents), equipment (including all accessions and additions thereto), general intangibles (including payment intangibles, software, trademarks, copyrights, patents and any and all other intellectual property and proprietary rights of Borrowers), goods (including fixtures), instruments (including promissory notes), inventory (including all goods held for sale or lease or to be furnished under a contract of service, and including returns and repossessions), investment property (including securities and securities entitlements), letter of credit rights, money, and all of Debtor's books and records with respect to any of the foregoing, and the computers and equipment containing said books and records, website, brands, trademarks, URL's and molds for manufacturing; and

(b) any and all cash proceeds and/or noncash proceeds of any of the foregoing, including, without limitation, insurance proceeds, and all supporting obligations and the security therefor or for any right to payment. All terms above have the meanings given to them in the Georgia Uniform Commercial Code, as amended or supplemented from time to time.